Redacted Version

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### (BID PROTEST)

| | |
|---|---|
| DZSP 21 LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES, | )  **No.   18-705C** |
| | )  **Judge Charles F. Lettow** |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| FLUOR FEDERAL SOLUTIONS, LLC, | ) |
| | ) |
| Defendant-Intervenor. | ) |
| | ) |

### FLUOR FEDERAL SOLUTIONS, LLC's CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND OPPOSITION TO DZSP 21 LLC's MOTION FOR <u>JUDGMENT ON THE ADMINISTRATIVE RECORD</u>

For the reasons detailed in its Memorandum in Support of Fluor Federal Solutions, LLC's ("Fluor") Cross-Motion for Judgment on the Administrative Record and Opposition to DZSP's Motion for Judgment on the Administrative Record, Defendant-Intervenor Fluor requests that this Court grant Defendant Fluor's motion for judgment on the administrative record, and that of the United States, and deny Plaintiff DZSP 21, LLC's motion for judgment on the administrative record and request for a permanent injunction prohibiting the Defendant from proceeding with the contract awarded to Fluor under Solicitation No. N62742-13-R-1150.

Redacted Version

Respectfully submitted,

s/ Richard B. O'Keeffe, Jr.
Richard B. O'Keeffe, Jr.
WILEY REIN LLP
1776 K Street, N.W.
Washington, DC 20006
Tel: (202) 719-7396
Fax: (202) 719-7049
rokeeffe@wileyrein.com

June 28, 2018

*Of Counsel:*
Samantha S. Lee
George E. Petel
William A. Roberts, III
WILEY REIN LLP

Redacted Version

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## BID PROTEST

| | |
|---|---|
| DZSP 21 LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | **No.    18-705C** |
| ) | **Judge Charles F. Lettow** |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| FLUOR FEDERAL SOLUTIONS, LLC, ) | ███████ |
| ) | |
| Defendant-Intervenor. ) | |

## FLUOR FEDERAL SOLUTIONS, LLC's
## MEMORANDUM IN SUPPORT OF ITS CROSS-MOTION FOR JUDGMENT
## ON THE ADMINISTRATIVE RECORD AND OPPOSITION TO DZSP 21 LLC'S
## MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

Richard B. O'Keeffe, Jr.
WILEY REIN LLP
1776 K Street, N.W.
Washington, DC 20006
Tel: (202) 719-7396
Fax: (202) 719-7049
rokeeffe@wileyrein.com

June 28, 2018

*Of Counsel:*
Samantha S. Lee
George E. Petel
William A. Roberts, III
WILEY REIN LLP

███████████████████████

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................1

ISSUES PRESENTED ....................................................................................................7

COUNTERSTATEMENT OF FACTS ..............................................................................7

ARGUMENT ...............................................................................................................11

I.      The Navy Appropriately Exercised Its Discretion to Conclude that
        the Existing Solicitation Sufficiently Sets Forth the Navy's Needs. ..........................11

II.     The Navy's Cost Realism Analysis Was Reasonable. ..................................................16

III.    The Navy's Staffing and Resources Evaluation Was Reasonable. ..............................20

IV.     The Navy's Past Performance Evaluation Was Reasonable. ......................................25

V.      The Navy's Technical Approach Evaluation Was Reasonable. ..................................31

VI.     The Navy's Source Selection Decision Was Reasonable. ...........................................32

VII.    DZSP Is Not Entitled to Permanent Injunctive Relief. ...............................................33

CONCLUSION ............................................................................................................35

Redacted Version

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                    **Page(s)**

*Akal Security, Inc. v. United States,*
   87 Fed. Cl. 311 (2009) .......................................................................................34

*AT&T Communications, Inc. v. Wiltel, Inc.,*
   1 F.3d 1201 (Fed. Cir. 1993) ......................................................................13, 14

*Bannum Inc. v. United States,*
   779 F.3d 1376 (Fed. Cir. 2015) ...........................................................................11

*Blue & Gold Fleet, L.P. v. United States,*
   492 F.3d 1308 (Fed. Cir. 2007) ...........................................................................11

*Ceres Gulf, Inc. v. United States,*
   94 Fed. Cl. 303 (2010) .......................................................................................34

*Comint Systems Corp. v. United States,*
   700 F.3d 1377 (Fed. Cir. 2012) ...........................................................................11

*CW Government Travel, Inc. v. United States,*
   61 Fed. Cl. 559 (2004) .......................................................................................35

*Galen Medical Associates v. United States,*
   369 F.3d 1324 (Fed. Cir. 2004) ...........................................................................32

*Golden Manufacturing Co. v. United States,*
   107 Fed. Cl. 264 (2012) .....................................................................................13

*Guardian Moving & Storage Co. v. United States,*
   122 Fed. Cl. 117, 132 (2015) .............................................................................31

*Lockheed Martin Corp. v. United States,*
   124 Fed. Cl. 709 (2016) .....................................................................................31

*Madison Services, Inc. v. United States,*
   92 Fed. Cl. 120 (2010) .........................................................................................1

*PGBA, LLC v. United States,*
   389 F.3d 1219 (Fed. Cir. 2004) ...........................................................................34

*Precision Asset Management Corp. v. United States,*
   135 Fed. Cl. 342 (2017) .....................................................................................25

Redacted Version

*Reilly's Wholesale Produce v. United States*,
73 Fed. Cl. 705 (2006) ................................................................................................34

*Sotera Defense Solutions, Inc. v. United States*,
118 Fed. Cl. 237 (2014) ...........................................................................................3, 33

**Regulations**

48 C.F.R. § 15.206 ........................................................................................................12

48 C.F.R. § 15.308 .......................................................................................................2, 3

**Other Authorities**

Daniel J. Hughes & Harry Bell, *Moltke on the Art of War: Selected Writings*
(1993)..........................................................................................................................12

## PRELIMINARY STATEMENT

This protest is about the discretion of a Source Selection Authority ("SSA") to make an independent decision to award a contract.  Once the SSA has been duly appointed to her role, the exercise of that discretion has nothing whatsoever to do with the SSA's qualifications—it doesn't matter whether she has a PhD or a GED—although this SSA is extraordinarily well qualified by education and experience.[1]  It has nothing to do with how fast she made her decision—22 days or 22 weeks or 22 months—although considering how she decided to address the corrective action, the time taken was more than sufficient.  It has nothing to do with whether the SSA's course of action was straightforward or labor-intensive—although having chosen her course of action, the SSA performed a detailed evaluation and documented her decision meticulously.[2]  Finally, and most importantly, it has nothing to do with what other source selection authorities did in other source selections.

---

[1] The SSA Decision Document states that Captain La Duca, the SSA, is:

> [A] senior officer in the Navy's Civil Engineer Corps, and [is] currently the Vice Commander of the Naval Facilities Engineering Command Pacific which is responsible for, among other matters, overseeing the delivery of all public works services to the Navy within the Pacific area of responsibility, to include Guam. [She has] also served as the Commanding Officer of Naval Facilities Engineering Command Far East and as such was directly responsible for ensuring the delivery of critical base operating support services to multiple Navy and Marine installations in the Pacific and Indian Ocean areas.  [She also holds] a Bachelor of Science degree from the U.S. Naval Academy as well as a Master's of Science in Civil Engineering from the University of California, Berkeley and a Doctorate in Industrial Engineering from the University of Alabama in Huntsville.

AR Tab 240 at 29776.

[2] DZSP charges that "[i]n the end, the Navy's most recent decision appears to be the direct result of the Navy taking the path of least resistance — a re-award to the current contract holder."  Am. Compl. at 16.  Even if, by so asserting, DZSP is challenging the SSA's good faith, it has failed to meet the high burden of proof required to warrant such a finding.  *See Madison Servs., Inc. v.*

Redacted Version

It doesn't matter whether anyone else in the world would have done things differently.  It doesn't matter whether anyone else in the world would have reached different underlying evaluative judgments and made a different trade-off.  It doesn't matter whether anyone else in the world would, in prior source selections, have considered a smaller price premium to be not worth the superior technical merits offered by the Fluor proposal.  All that matters now is whether this SSA was entitled, in this source selection, to value certain specific aspects of Fluor's proposal so highly that Fluor's slightly higher proposed cost was judged to be worth the premium; whether those findings and rationale were responsive to the Court's prior ruling; and whether they were adequately documented in the contemporaneous record.

She was and they were.

In FAR Part 15 negotiated procurements, the requirements for a valid source selection decision are short and simple: they must "be based on a comparative assessment of proposals against all source selection criteria in the solicitation."  48 C.F.R. § 15.308.  SSAs may, but are not required, to rely on the expertise of others in that they "may use reports and analyses prepared by others, [and] the source selection decision shall represent the SSA's independent judgment."  *Id.*  As for content, there is no minimum amount of information or depth of analysis required, but the written decision must "include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs."  *Id.*

---

*United States*, 92 Fed. Cl. 120, 129 (2010) (noting "well-established principle that contracting officials are presumed to act in good faith when executing their procurement functions") (internal quotation marks and citation omitted).

Redacted Version

Moreover, the SSA "need not quantify the tradeoffs that led to the decision." *Id.* Navy Captain

M.C. La Duca's source selection decision more than met these requirements.

DZSP compares the instant source selection to decisions made in past Guam Base

Operating Support ("BOS") Services source selections, arguing that asserted analytical

shortcomings here are "***particularly problematic*** given that based upon those exact same

strengths and weaknesses in September 2016, the Navy made the exact opposite award decision,

and the current [source selection decision] provides no reasonable justification for the Navy's

about-face." DZSP MJAR at 34 (emphasis added). This is flat wrong on the facts—although the

adjectival ratings may remain, the SSA's evaluation of proposals is different now than the

different SSA's assessment in September 2016. Even if DZSP were right on the underlying

facts, its assertion is not only unsupported by citation to legal authority, but also contradicted by

decisions of this Court. In a 2014 protest, the plaintiff argued, much as DZSP has done here,

"that a trade-off decision must be ***especially well-documented*** when, after re-evaluating the same

proposals, an agency cancels an award to one offeror so as to award the contract to another."

*Sotera Def. Sols., Inc. v. United States*, 118 Fed. Cl. 237, 263 (2014) (emphasis added). In

rejecting this argument, the Court stated that, under FAR 15.308, there is no "heightened

standard for documentation when an SSA changes his mind as to contract award." *Id.*

Thus, the Court must judge the instant source selection decision on its own merits under

FAR Part 15 standards, and for consistency with the prior ruling of this Court, as the independent

judgment of a duly appointed SSA, on April 13, 2018—not against the actions of any other SSA

on any other date. This SSA had two evaluative tasks to perform in compliance with the Court's

March 22, 2018 decision, and she executed those tasks perfectly, as explained below: first by re-

evaluating Fluor's staffing and resources (Sec. III); and second, by re-evaluating DZSP's cost

Redacted Version

realism (Sec. II).  In each of these actions, DZSP got everything it could have hoped for, but that does not entitle it to automatic award of the Guam BOS Contract because the SSA found that, "considering Fluor's superior technical proposal and DZSP's lower evaluated cost and have concluded that Fluor provides the best value proposal to the Navy."  AR Tab 240 at 29775.

The SSA complied with all procedural requirements of the Solicitation.  She reviewed and applied only the stated evaluation criteria.  She recognized the relative weights of the evaluation factors for award.  She used the published source selection method of a best value trade-off.  *Id.* at 29776-67.  She followed the rules.

DZSP accuses the SSA of doing "little more than 'parrot[ing]' back' the previously identified strengths and weaknesses in each proposal."  DZSP MJAR at 34.  Not so.  The SSA "substantially adopted those parts of [her] prior decision and analysis that were not found to be erroneous and [] restated such conclusions in this memorandum using a similar format as was used in [her] earlier decision."  AR Tab 240 at 29775.  When she found evaluations to have been erroneous, she explicitly accounted for the changes.  For example, while ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, she stated that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, overall for Factor C, I have determined Fluor's proposal meets the requirements and indicates an exceptional approach and understanding of the requirements."  *Id.* at 29794.  But even if she had adopted the previous evaluation result *verbatim*, that would not invalidate her ultimate source decision.

That analysis began by recognizing that Fluor's superior proposal for the non-Cost factors entailed a higher cost, but she reasonably noted that the differential between the cost of Fluor's superior approach was ▮▮▮▮▮▮▮ more than the Cost of DZSP's proposal, with its inferior non-Cost ratings reflecting its weaker, less innovative proposal.  The SSA's assessment

of the comparative merits of the offerors' Factor D, Technical Approach proposals was

important, so the record reflects, to the ultimate source selection decision.  Building on a lengthy

and detailed analysis of this factor, the SSA concluded that "Fluor's exceptional technical

approach provides *significant qualitative value* to the Government in comparison to DZSP's

thorough approach."  *Id.* at 29799 (emphasis added).  Building in turn on this and many other

detailed evaluative judgments, and once again acknowledging DZSP's Cost advantage of

███████████████  the SSA stated that "[w]hile DZSP's cost is lower, in my professional

judgment, I find that Fluor's superior technical proposal provides advantages to the Government

that are *well worth the additional cost*."  *Id.* at 29800 (emphasis added).  The SSA could have

ended her decision right then and there and she would have complied with FAR 15.308.  But she

went further.

The SSA recounted the specific aspects of Fluor's proposal that were "well worth the

additional cost," focusing on the discriminators: ████████████████████████

████████████, respectively.  *Id.*  And in conclusion, *though not required to do so* (and

ignored entirely by DZSP in its pleadings), the SSA did explicitly address the fact that her

decision differed from prior source selections.  This aspect of the source selection decision

warrants great attention because, on the foundation of the SSA's education, experience, integrity,

knowledge of the procurement and study of the competing the proposals, it concisely and

directly refutes the core premises of the DZSP protest.  The SSA begins the final paragraph of

her decision by recognizing "that the previous SSA came to a different conclusion with regard to

the best value analysis."  *Id.* at 29801.  This prior decision was not controlling now, the SSA

wrote, because the SSA's "evaluation of the proposals resulted in significant differences."  *Id.*

She directly referred to "where [her] evaluation of the relative strengths of the proposals differed

Redacted Version

from the evaluation of the prior SSA and the reasons why." *Id.* The SSA then stated that she

had "brought to bear [her] own experience in overseeing public works base operating support

services, and have made an independent decision as to the best value proposal." *Id.*

The SSA concludes her rationale for the source selection with a reiteration for the

substantive, qualitative reasons for selecting Fluor over DZSP:

> Fluor's proposal provides a superior technical approach that is advantageous to the
> Government and demonstrates through its experience, past performance, safety and
> execution of work supporting small business concerns, that it can successfully
> perform the work required in the PWS.  As detailed above, Fluor provides the
> overall best value to the Government.

*Id.*

DZSP does not confront this or any other critical aspects of the decision—the parts where

the SSA makes explicit that, in her professional judgment, Fluor's proposal is better than DZSP's

and well worth ███████ cost premium created by the SSA's corrective action following the

Courts decision.  In other words, DZSP does not confront the aspects of the decision that reflect

that the SSA exercised her independent judgment and documented her source selection decision

in accordance with the FAR after reevaluating proposals in a manner that heeded and respected

this Court's prior decision in this procurement.  Below we address the specific arguments that

DZSP advances but which evade the real and only material question, whether the SSA was

entitled to make the professional judgments that were the basis of her source selection decision.

She was and she did.

Redacted Version

## ISSUES PRESENTED

1. Whether the Navy acted reasonably when it heeded the Court's injunction "to perform a new evaluation of DZSP's and Fluor's proposals or to conduct an entirely new solicitation, whichever it chooses."

2. Whether this Court should upset the Navy's reevaluation of DZSP's and Fluor's proposals based on DZSP's disagreement with the Navy's judgment.

3. Whether this Court should permanently enjoin the Navy, disrupting this procurement and the delivery of these essential Guam BOS services, when DZSP has not carried its heavy burden to prove entitlement to such extraordinary relief.

## COUNTERSTATEMENT OF FACTS

After GAO for the third time identified errors in the Navy's evaluations of competing proposals for and awards to DZSP of the Guam BOS Services Contract under Solicitation No. N62742-13-R-1150, the Navy appointed a new SSA for this procurement. AR Tab 193. In July 2017, that SSA—Captain M.C. La Duca—determined that Fluor had earned the Contract. *Id.*

After DZSP unsuccessfully protested that award at GAO, DZSP challenged it again in this Court. *See* AR Tab 238. DZSP presented four arguments: (1) the Navy's needs and requirements have changed so significantly since the 2013 release of the Solicitation that the Navy must conduct a new competition; (2) the Navy unreasonably interpreted Fluor's proposal ███████████████████████████████████████████████████████████████ ███████████████████████████████████████; (3) the Navy unreasonably rejected DZSP's proposed ███ escalation in Exempt Labor rates over an 8-year contract term as unrealistic; and (4) the Navy failed to normalize DZSP's and Fluor's application of a Guam Tax. *Id.*

Redacted Version

The Court rejected two of DZSP's arguments.  *Id.*  First, although it recognized that DZSP had offered data about its work under bridge contracts during the procurement that "arguably would amount to 'a significant change in the government's requirements,'" *id.* at 29765, the Court ultimately concluded that it "will not require the Navy to amend its 2013 solicitation":

> The military assets based on Guam by the Navy, Marine Corps, and Air Force have very significantly expanded over recent years.  Even so, the Navy, not the court, is in the best position to determine its needs, and this court "give[s] great deference to the professional judgment of military authorities concerning the relative importance of . . . particular military interest[s]."  *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (internal quotation marks and citations omitted). It simply is not the place of the court to substitute its judgment for that of the agency respecting support of defence installations on Guam.  *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

*Id.* at 29766.  The Court also declined to "second guess" the Navy's approach to the Guam Tax. *Id.* at 29770.

The Court did, however, find that Fluor's proposal ████████████████ ███████████████████████████, and thus was "not deserving of a strength in retaining incumbents."  *Id.* at 29767-68.  The Court also concluded that the record did "not support the Navy's determination that DZSP's ████████████████████████████ ██████████████████████████████████████████████ ███████████████████████ was unrealistic, and the Navy's associated cost realism adjustment to DZSP's Exempt Labor rates based on the upward trend in Exempt Labor salaries evidenced in bridge contract data was unjustified.  *Id.* at 29770.

Consistent with these conclusions, the Court ordered that "the Navy is enjoined to perform a new evaluation of DZSP's and Fluor's proposals or to conduct an entirely new solicitation, whichever it chooses."  *Id.* at 29772.

-8-

After considering the Court's opinion and order, the SSA documented her decision to choose the option to perform a new evaluation of DZSP's and Fluor's proposals, and went on to document that reevaluation and associated new award decision.  AR Tab 240.  The SSA's reevaluation was based on her review of the Court's opinion and order, evaluator reports, and DZSP's and Fluor's proposals.  *Id.* at 29766.  To conduct the independent assessment of those proposals and tradeoff decision mandated by the Solicitation, the SSA applied the technical and professional expertise gained during her career as an officer in the Navy and her advanced education, including a doctorate in Industrial Engineering.  *Id.*

As has always been the case, although DZSP's and Fluor's adjectival ratings for four of five factors are similar, the SSA's comparative, qualitative assessment of proposals against the Solicitation's criteria reveals that Fluor's proposal was superior.  *Id.* at 29796-29800.  As specifically documented by the SSA, Fluor offered



.  *Id.* at 29798.  Fluor also has the edge in

.  *Id.* at 29799.  The SSA found that Fluor's proposed

.  *Id.*  For the other non-price factors, the SSA concluded that neither DZSP nor Fluor offered an advantage over the other.  *Id.* at 29797-29800.

Weighing the [REDACTED] differential in total evaluated prices, the SSA determined that Fluor's proposed approach would improve "

-9-



▮▮▮▮" and "▮▮▮▮▮," ▮▮▮▮▮▮▮▮▮▮, and "▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮," and concluded that Fluor's technical innovations were worth ▮▮▮▮ price premium for this 8-year contract. *Id.* at 29800-01.

DZSP now protests again. DZSP first resurrects its argument that the Navy had to amend the Solicitation based on the same alleged changes in the requirements in Guam since 2013 that DZSP asserted in its last protest in this Court. DZSP MJAR at 16-20. DZSP then challenges the SSA's decision to consciously and consistently exclude bridge contract data from the cost realism analysis and instead scope the depth and breadth of the cost realism review on the Solicitation's requirements and the offeror's proposals. *Id.* at 20-24. DZSP also alleges that the SSA did not go far enough when she concluded that there is a chance that Fluor ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮. *Id.* at 24-28.

DZSP then turns to new arguments based on differences between the SSA's reevaluation of proposals and previous, superseded evaluations and award decisions. DZSP argues that the SSA was obligated to give DZSP credit for two past performance references that DZSP identified ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ *Id.* at 28-32. DZSP also argues that it was prejudiced by a change in the wording of an adjectival rating under the Technical Approach Factor. *Id.* at 32-33. Finally, DZSP characterizes this SSA's independent evaluation and award decision as a generalized and unjustified "reversal" of a different SSA's previous, superseded award to DZSP. *Id.* at 33-38.

<u>**ARGUMENT**</u>

**I.** <u>**The Navy Appropriately Exercised Its Discretion to Conclude that the Existing Solicitation Sufficiently Sets Forth the Navy's Needs.**</u>[3]

DZSP's attack on the SSA's decision not to re-start the Guam BOS procurement rests on the assumption that she needed to presume that the changes to the contractual requirements were of such a nature as to require re-solicitation.  They were not.

DZSP's announcement that, "for the first time in this procurement," the Navy has recognized that the requirements have changed, DZSP MJAR at 16, is not newsworthy.  Of course they have, and the Navy has never denied that changes have occurred—an untenable position had it ever done so.  In the field of armed conflict "no plan of operations extends with

---

[3] Before addressing the propriety of the SSA's decision, Fluor renews its assertion that DZSP's flagship protest ground—demanding that the Navy start all over and launch a brand-new solicitation, because of "exponential" changes in requirements—remains untimely.  The Federal Circuit has ruled that when a party acts as DZSP has in this procurement, it forfeits the right to assert a challenge the terms of a solicitation as DZSP now does in this protest count:

> [A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection afterwards in a § 1491(b) action in the Court of Federal Claims.

*Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1315 (Fed. Cir. 2007); *see also Bannum Inc. v. United States*, 779 F.3d 1376, 1380 (Fed. Cir. 2015) ("A waiver rule implements this statutory mandate by reducing the need for the 'inefficient and costly' process of agency rebidding 'after offerors and the agency ha[ve] expended considerable time and effort submitting or evaluating proposals in response to a defective solicitation.'").  Based on changes DZSP has alleged, DZSP needed to file a protest—at the very latest—before the Navy's 2017 award of the contract to Fluor.  *See Comint Sys. Corp. v. United States*, 700 F.3d 1377, 1382 (Fed. Cir. 2012) (rejecting as untimely a challenge to a defect in a solicitation introduced by an amendment that all agreed had been "adopted after the bidding process closed" because it was not raised before award).  Because DZSP waited until after award to Fluor to spring forward with this protest, it waived its right to do so.  *Id.*

Redacted Version

any certainty beyond the first contact with the main hostile force."[4]  So it is in a Government procurement, conducted over a period of months or even years, that no requirement survives perfectly intact when real-world conditions and shifting agency priorities have had their rough ways with it.  Change is inevitable.

DZSP's argument begs the critical question of whether any changes in the Navy's requirements are material and whether DZSP suffered prejudice which demands corrective action.  Citing FAR 15.206(a),[5] DZSP claims that "only one question" matters:  "[h]ave the agency's requirements changed."  DZSP MJAR at 18.  There is no authority to support DZSP's allegation that any change whatsoever in requirements requires a new solicitation.  And DZSP has mischaracterized the nature of the SSA's recognition of change—she simply acknowledged the "lengthy period of time that has passed since [the Guam BOS] solicitation was issued as well as changes that have occurred in the requirements."  AR Tab 240 at 29775.  There is no Navy admission that any changes affected the validity of the solicitation to support her source selection.  Moreover, the Court itself, in its prior ruling which deferred to the Navy on this issue, found only that they "*arguably* would amount" to a change necessitating an amendment to the solicitation.  AR Tab 238 at 29765 (emphasis added).  The Court nevertheless concluded that "the Navy, not the court, is in the best position to determine its needs."  *Id.* at 29766.

---

[4] Helmuth von Moltke, quoted in Daniel J. Hughes & Harry Bell, *Moltke on the Art of War: Selected Writings* (1993).

[5] The full provision cited states "[w]hen, either before or after receipt of proposals, the Government changes its requirements or terms and conditions, the contracting officer shall amend the solicitation."  FAR 15.206(a).

Redacted Version

That is why the Court crafted the relief in DZSP's earlier protest in the manner it did. The Navy was "enjoined to perform a new evaluation of DZSP's and Fluor's proposals or to conduct an entirely new solicitation, whichever it chooses." *Id.* at 29772.  DZSP is in the same position it was when the Court last denied this protest ground and left that decision to the Navy. DZSP points to the exact same bridge contract data that it had during the last protest.  DZSP MJAR at 17.  The Navy acknowledged that some things have changed since 2013 but concluded nonetheless that a new solicitation was not warranted.  DZSP ignores the Navy's Court-fashioned discretion to choose not to amend this Solicitation, and suggests that the SSA's acknowledgment of the Court's opinion and order is a concession that it had no such option.  In so doing, DZSP leaves the Court not only with a misleading impression of the SSA's discretion, but also an inaccurate statement of the law on when a change to requirements demands solicitation re-start.

A change in requirements necessitates an amendment to a competitive solicitation only when the change is ***cardinal***—that is to say, when the change entails a substantial risk that the relative competitive standing of offerors could be altered by it.  As this Court stated in 2012, in the context of a protest of an agency's failure to amend the terms of a solicitation following a change to requirements, "[t]he cardinal change doctrine was developed to discern whether modifications to a government contract were severe enough to constitute a breach of contract by the government." *Golden Mfg. Co. v. United States*, 107 Fed. Cl. 264, 274 (2012).  Application of this doctrine in bid protests is not new.  As pronounced by the Court of Appeals for the Federal Circuit in 1993, the focus for decades has been on the effect of a change on competition and asks, "whether Government modifications changed the contract enough to ***circumvent the statutory requirement of competition***." *AT&T Commc'ns, Inc. v. Wiltel, Inc.*, 1 F.3d 1201, 1205

(Fed. Cir. 1993) (emphasis added).  The Federal Circuit explained that "[a] modification generally falls within the scope of the original procurement if potential bidders would have expected it to fall within the contract's changes clause."  *Id.*

In this procurement, beyond the broad scope of permissible modifications to requirements permitted by the Changes Clause, offerors should have expected, and needed to plan in their Technical Approaches for, "fluctuations in mission requirements" requiring "surge/contingency operations."  AR Tab 194 at 27110.  DZSP recognized that such changes would occur and devoted substantial portions of its Technical Approach volume to accounting for this very risk— including major changes in requirements.  *See generally* AR Tab 150b at 23857-9.  DZSP sold its approach and expertise in this area aggressively.



*Id.* at 23858.  Not only did DZSP expect major changes, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉  AR Tab 240 at 29786.  The Technical Evaluation Team ("TET") explained DZSP's capability in terms that reflect changes of a substantial quantum.



AR Tab 168 at 26025.  Thus, DZSP itself expected—▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

Redacted Version

███████████████████████████   over the eight years of performance.  So yes, DZSP

expected big changes in requirements.

DZSP confronts none of this, and it makes no effort to prove the prejudice allegedly

suffered because of the requirements changes, other than by stating that, in "its prior protest,

DZSP described in great detail how it would have updated its proposal in light of the changes

present in Guam."  DZSP MJAR at 19-20.  Such an incorporation by reference of matters

asserted in the prior protest does not adequately meet the protester's burden to demonstrate

prejudice, nor does it properly put these matters before the Court.  Even if the Court takes

cognizance of them, Fluor would request a reciprocal recognition and consideration of its

rebuttal to DZSP's arguments on prejudice.  For now, all we have is DZSP's categorical

assertion that "[t]he changes are so significant that it is impossible to know exactly how they will

affect the competition, until the Navy amends the RFP and obtains revised proposals."   DZSP

MJAR at 20.  Speculation is no substitute for proof.

The hole in DZSP's attack on the SSA's decision not to restart the procurement with a

new solicitation is that DZSP presumes prejudice based on its unsupported theory that any

change necessitates a revised solicitation.  The Court, by its prior ruling, appropriately applied

the law to find that any such changes were not so material as to require amendment, and thus any

Navy decision to amend the solicitation or not was permissible.  The SSA's decision not to do so

is consistent with the Navy's position in the prior DZSP protest at this Court that offerors were

on notice of the fact that the requirements of a forward-deployed set of military bases in the

volatile East Asia/Pacific region could shift dramatically over time—up or down depending on

protean national security considerations, and that the existing Solicitation was sufficient to

Redacted Version

capture that variation.  DZSP's demand for a brand-new solicitation now is consistent with the same unsuccessful argument this Court rejected before.

## II.  <u>The Navy's Cost Realism Analysis Was Reasonable.</u>

DZSP won't take "yes" for an answer.

In the first DZSP protest in this forum, the Court faulted the Navy's analysis of DZSP's cost proposal realism, stating that "it was not reasonable for the Navy to selectively use the bridge contract" as part of its basis for the assessment of an upward most probable cost ("MPC") adjustment.  AR Tab 238 at 29769.  As a result, the Court questioned the validity of that ███ ███ adjustment, stating that the "record does not support the Navy's determination that DZSP's ████████ was unrealistic, and the Navy's upward adjustment of DZSP's costs proposal because of changed circumstances evidenced by the bridge contracts was arbitrary and capricious." *Id.* at 29770.  In corrective action, the SSA gave DZSP everything that it could have asked for in response to this critique, eliminating the bridge contract data from consideration and concluding that no cost realism adjustment was necessary to DZSP's proposed costs, thereby reducing DZSP's cost competitive disadvantage *from* ████████ *to zero* and creating the ████████ cost advantage that it now enjoys.  Regardless of the SSA's rationale for doing so, for what greater competitive improvement could DZSP have hoped?  In any event, as explained below, the SSA's decision not to use the bridge contract data was reasonable and documented in the contemporary record.

It is important first to understand the limited role that the bridge contract data played in the Cost Evaluation Team's ("CET") analysis.  The CET used the data only as a "canary-in-the-coal-mine" warning signal that DZSP's exempt labor rates—████████ the eight-year life of the contract—were unrealistic for DZSP's technical approach.  In two hypotheticals marshaling

Redacted Version

labor rate data for "89 comparable Exempt employees," the CET compared "Bridge 1" and "Bridge 2" rates to the 2013 initial proposed DZSP rates, resulting in potential average upward rate changes of ███████████  AR Tab 192 at 26974-75. These averages were not, however, used to quantify the specific MPC adjustment ultimately assessed, because the CET found that the bridge contracts were "only awarded for six months at a time which may have caused upward pressure on wages due to uncertainty with employment." *Id.* at 26975. Thus, instead of using rates negotiated in the hothouse environment of a short-term, sole-source bridge contract procurement, the CET used a much more modest factor of ████, based on an eight-year average from the Guam Bureau of Statistics Consumer Prive Index, to calculate the adjustment. *Id.* at 26977. The CET used the bridge contract data for no other purpose.

The CET's business judgment, documented in the contemporaneous record, to rely on the bridge contract data as a single indicator for concern about DZSP's approach, and rejection of any further reliance on the bridge contract data because the short-term nature of the bridge contracts "may have caused upward pressure on wages" supports the rationality of the SSA's decision not to use the bridge contract data at all. In other words, the SSA reasonably concluded that these bridge contracts awarded under anomalous short-term conditions were not a reliable measure or source of data for what the Government could expect to pay for DZSP's proposed different technical approach. Moreover, the problematic ***non-competitive*** nature of the bridge contract procurements comes through in the SSA's decision to base her analysis of cost realism "on that information provided by offerors ***in response to the RFP***." AR Tab 240 at 29779 (emphasis added). In assessing cost realism, it was reasonable for the SSA to rely solely on proposals submitted by Fluor and DZSP in a competitive procurement.

But that's not all the SSA had to say about her decision.  DZSP inaccurately and inconsistently recounts the SSA's work on this issue.  First, DZSP states that "the Navy *made no attempt* to explain why it reversed its prior recognition that the bridge contracts are relevant."  DZSP MJAR at 21 (emphasis added).  Then DZSP states that "*the only explanation the Navy provides* for not relying upon the bridge contract data is that the data ███████████████████████████████████████ that would assist with a cost-realism analysis.'"  *Id.* at 23 (emphasis added).  *Neither is accurate—the SSA made two discernible, discrete points* relative to the bridge contract data.  Considering the confusion these varying accounts engender, the fair adjudication of this protest would benefit from a full, *verbatim* rendition of what the SSA said.

> In consideration of the Court's concern with the Navy's limited use of labor costs under DZSP's bridge contracts as reflected in the June 30, 2017 CET's cost realism analysis, I have determined to base the cost realism analysis only on that information provided by offerors in response to this RFP. **[1]** Specifically, I did not consider DZSP's experience with the employment of exempt employees under the Guam BOS bridge contracts because this procurement only is evaluating the offerors' capabilities with respect to this RFP's Performance Work Statement (PWS). **[2]** I also note that these bridge contracts do███████████████ ███████████████ that would assist with a cost-realism analysis and that such data is not otherwise contained in the proposals or otherwise available.

AR Tab 240 at 29779 (bracketed numbering added).

Thus, the contemporaneous record shows that the SSA considered proposals submitted in response to the solicitation under which the work would be performed was more reliable.  Second, she observed as a basis for her decision the different ██████████████████ ████████████████  *Id.*  DZSP's only rejoinder to this point is that it "rings hollow, because ████████████████████ are not the only information to be gleaned from the bridge contract data relevant to a cost-realism analysis (consider the FTE counts above)."  DZSP MJAR at 23.  The reference to the "FTE counts above," DZSP refers, so it seems, to its (misleading) comparison of

Redacted Version

DZSP's Award Option Year budget, reflecting ▮▮▮ full time equivalent employees ("FTEs")—

which includes both a small Exempt Labor workforce and a much larger Nonexempt Labor

workforce the wages of which are governed by a collective bargaining agreement and which has

never been an issue in any protest under this Solicitation—to its Bridge Contract 3 Base Period,

showing ▮▮▮ overall FTEs.  *Id.* at 22.  DZSP hypes this ▮▮▮ FTE differential as "▮▮▮▮▮

more full-time employees."  *Id.*

     Even (misleadingly) suggesting that this entire differential is attributable to Exempt

Labor, DZSP's only point is that "the Navy's consideration of those changed FTE counts would

inform the Navy's assessment of performance risk associated with hiring all the necessary

additional personnel required to perform the work."  *Id.*  DZSP says in this regard that

consideration of the larger workforce would be needed to assess Fluor's performance risk,

asserting that this risk is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *Id.* at 23.

This leaves Fluor ▮▮▮▮▮▮▮▮▮▮▮▮ so DZSP says, and seems to imply that

Fluor may have performance risk because it may become insolvent—thereby becoming unable to

perform—if it must pay more Exempt Labor more than the proposed salary rates ▮▮▮▮▮

▮▮▮▮▮  This is a highly conjectural assertion for Fluor, a publicly-traded company listed

on the New York Stock Exchange with a market cap of $6.9 billion as of June 22, 2018.[6]  This

fanciful notion bespeaks desperation, appears to be the most that DZSP can muster and, in any

case, relates to Fluor's ***responsibility***, not to the responsiveness or merit of the company's

technical approach, much less to the realism of its cost proposal.  The upshot of this salvo is

---

[6] *See* https://ycharts.com/companies/FLR/market_cap (last visited by the author on June 24, 2018).

Redacted Version

negligible, considering DZSP has made no argument which even suggests that consideration of

the increased FTE count would somehow benefit DZSP competitively.

We repeat, DZSP received all that it could have reasonably hoped through corrective

action as for relative costs as a factor in the source selection trade-off and decision.  In no event

can it fairly be said that DZSP has made a credible case that it deserves anything more.

### III.    The Navy's Staffing and Resources Evaluation Was Reasonable.

When the SSA returned to the evaluation of the Staffing and Resources Factor, she

determined that DZSP's Staffing and Resources adjectival rating remained Outstanding, earned

because she identified no weaknesses in DZSP's Staffing and Resources approach and agreed

with DZSP's favorite evaluators—the TET—in identifying five strengths in DZSP's proposal:

AR Tab 240 at 29786.

At the same time, the SSA accepted that DZSP's true proposed approach to Exempt

Labor was ████████████████████████████████, but instead was a

████████ *Id.* at 29785.  As the TET had before her, the SSA concluded that this ████████

████  ████████████████████████████████. *Id.*

The SSA accepted DZSP's approach, but acknowledged it ████████████████████

" *Id.*  Concluding that DZSP's proposal "

Redacted Version



," the SSA

determined that DZSP's overall approach to Staffing and Resources was "very low" risk. *Id.* at

29786. DZSP has no objection to any of this.

Turning to Fluor, the SSA again found strengths in Fluor's approach, including, as

identified by the TET, "

*Id.* at 29794. Again, DZSP finds no fault here.

On Exempt Labor, the SSA acknowledged the TET's comments that Fluor's goal of 95%

incumbent recruitment would "be challenging to implement" at the salaries proposed. *Id.* at

29793. The SSA accepted that the TET's associated concerns about morale and retention were

not mitigated by Fluor's proposal to                                    , and

concluded that the lower proposed salaries "may preclude Fluor from meeting its 95%

recruitment goal for incumbent personnel and thus, acknowledge that Fluor's exempt workforce

may be less experienced than the current incumbent workforce." *Id.* at 29794. She accordingly

*Id.*; AR Tab 95 at 13856 (                ). She

went on to conclude that—in part because Fluor's proposed salaries were based on Fluor's

██████████████████████████████████████████████████

███████████████████████████████—they "do not present any significant risk to

performance and that Fluor otherwise demonstrated appropriate recruitment strategies and

approaches that would allow Fluor to recruit and maintain a qualified exempt labor force." *Id.* at

29793-94.  These appropriate recruitment strategies and approaches include ███████████

████████████████████████████████████████████████

███████████████ that the Court recognized meant that not even DZSP "contested that Fluor

could provide qualified personnel."  AR Tab 238 at 29767-68; *see also* AR Tab 95 at 13584

("The TET determined that FFS' proposed number of FTEs meets the PWS requirements and

ability to hire qualified exempt personnel are not considered a risk of successful performance.").

DZSP asserts that "Fluor's likely inability to retain DZSP's incumbent workforce ***had no***

***bearing*** upon [the SSA's] evaluation of Fluor's proposed staffing approach (or, ultimately, her

award decision)," that the SSA "gave no consideration whatsoever" to alleged risk and disruption

"that would result from Fluor's inability to retain" incumbents, and that the SSA did not explain

why Fluor still deserved an Outstanding rating.  DZSP MJAR at 25-27.  There are at least three

problems with DZSP's argument.

First, necessary to DZSP's argument is a belief that Fluor will be unable to retain any

member of DZSP's Exempt Labor workforce.  *See, e.g.*, DZSP MJAR at 27 (arguing error based

on DZSP's perception that "Fluor's exempt-labor workforce is likely to consist entirely of

personnel that have never previously supported the JRM").  This is a mischaracterization of the

record.

The Navy did not conclude that Fluor would be unable to recruit and retain any of the █

██████ it proposed for Exempt Labor from the incumbent group—only that it would be

████████████████████████████████████████████████

challenging for Fluor to implement its proposed approach to retain 95% of all incumbent personnel based on its lower proposed salaries for Exempt Personnel.  AR Tab 95 at 13854; AR Tab 240 at 29793.  This measured conclusion is reasonable.  DZSP's speculation that Fluor's entire Staffing and Resources approach would collapse for failure to recruit any incumbents for Exempt Labor positions is not.  Indeed, in the short time that Fluor had to begin transition before DZSP filed this protest, Fluor managed to issue offer letters to all available, qualified Exempt Labor personnel to begin filling ███████████ it proposed.  Ex. 1, Decl. of ███████.  At the time of the stop work order, ████████████████████████████████████████ ████████████████████████████████████ to join Fluor's team.  *Id.*

Second, DZSP argues that the SSA failed to consider either the potential that Fluor would not successfully recruit 95% of the incumbent personnel or the consequences of that possibility. Of course she did.  The SSA first considered that DZSP proposed to ███████████████ █████████████████████████████████████████████████████████████ █████████████████████████████████████████████████ ████████.  AR Tab 240 at 29785.  She appropriately concluded that DZSP ████████████ ███████████████████████████████ and that accepting DZSP's proposal would mean accepting—as a certainty—"████████████████████████████████████ ████████████."  *Id.* at 29786.

The SSA considered that Fluor's plan to recruit and retain 95% of the incumbent personnel might not come to pass, and that the "exempt workforce may be less experienced than the current incumbent workforce."  *Id.* at 29794.

In each case, she considered the potential risk associated with the loss of incumbent Exempt Labor, and found it manageable.  DZSP's attempts to present its proposed ████████

-23-

████████████████████████████████████████████████



that posed less risk than Fluor's proposal to retain the Exempt Labor workforce should be

rejected. DZSP's ████████████ was merely DZSP's attempt to justify a decision to ████

████████████████████ AR Tab 114 at 16628-30. Accepting

DZSP's proposal means a guarantee that Exempt Labor retention ████████████████

████████████████ Accepting Fluor's proposal means some risk that—despite

Fluor's commitment to incumbent retention and its proven ability to recruit and retain

incumbents—it might not reach its goal to retain 95% of the overall workforce. That DZSP

believes that it is Fluor's proposal that should suffer in this situation is hard to understand.

Third, DZSP insists that the SSA did not explain why Fluor was still deserving of an

Outstanding adjectival rating. To the contrary, the SSA's decision explains why Fluor's Staffing

and Resources approach was still stellar, including the SSA's confidence that Fluor could recruit

and retain all necessary personnel and the SSA's concurrence that Fluor's approach merited the

assessment of many strengths related to ████████████████████████

████████████████████████████ AR Tab 240 at 29794.

In short, the SSA's evaluation fully considered that DZSP premised its proposal on a

promise not to retain the Exempt Labor workforce, and that Fluor's proposed salaries resulted in

some risk that Fluor might not deliver its plan to retain that same workforce. The SSA ultimately

determined that the offerors were essentially equal under this factor based, in part, on that

evaluation. DZSP's attempts to characterize the risk posed by Fluor's lower proposed salaries is

both inconsistent with the contemporaneous record and refuted by Fluor's actual experience on

this Contract.

Redacted Version

**IV.**     <u>**The Navy's Past Performance Evaluation Was Reasonable.**</u>

For Past Performance, the Solicitation required Offerors to submit at least three "recent relevant projects" as references for the Past Performance evaluation.  Tab 194 at 27105.  The Solicitation specifically provided that if an Offeror "utiliz[ed] past performance information of affiliates/subsidiaries/ parent/LLC/LTD member companies (name not exactly as stated on the SF33), the proposal shall clearly demonstrate that the affiliate/subsidiary/parent/LLC/LTD member companies will have meaningful involvement in the performance of the contract in order for the past performance information of the affiliate/subsidiary/parent/LLC/LTD member companies to be considered."  *Id.* at 27107.  To that end, the Solicitation directed Offerors to "state the specific resources (e.g., workforce, management, facilities, or other resources) that the affiliate/subsidiary/parent/ LLC/LTD member companies will commit towards performance of this contract."  *Id.*

In this regard, the Solicitation was consistent with the Court's established standard that an agency may only attribute the past performance of an Offeror's affiliate if the Offeror's proposal shows that the affiliate will be meaningfully involved in contract performance.  *See, e.g.*, *Precision Asset Mgmt. Corp. v. United States*, 135 Fed. Cl. 342, 357 (2017) ("As this court has held, an agency properly may attribute the experience or past performance of a parent or affiliated company to an offeror where the firm's proposal demonstrates that the resources of the parent or affiliated company will affect the performance of the offeror.  In determining whether this standard is met, the court examines whether the affiliate will have meaningful involvement in the contract performance.  Even if defendant were able to demonstrate meaningful involvement, the guidance merely permits, rather than requires, attribution of the affiliate's past performance to the offeror.  The GAO has given, as examples of meaningful involvement,

-25-

reliance on the workforce, management, facilities, or other resources of the parent or affiliated company.") (internal quotation marks and citations omitted)).

"Out of five past performance projects DZSP submitted," the SSA appropriately "determined that three met the RFP criteria for recent and relevant projects." AR Tab 240 at 29783. Specifically, the SSA determined that one of DZSP's past performance submissions would have no bearing on the likelihood of DZSP's success because ████████████████ ████████████████████████████████████████████████████, and for another that DZSP failed to prove that the affiliate would have "meaningful involvement" in the performance of the contract. *Id.* at 29780-82.

████████████████████████████████████████████████████ ███████████," AR Tab 150b at 23490, █████████████████████████, AR Tab 150a at 22487. DZSP is a three-member joint venture:



AR Tab 150b at 23495.

████████████████████████████████

Redacted Version

The Past Performance references found Not Relevant by the SSA were contracts not performed by DZSP.  *See* AR Tab 240 at 29780-82.  They



*See id.*; AR Tab 150b at 23503, 23509, 23549.

DZSP again makes its flawed argument that the SSA was bound to the prior TET evaluations.  *See* DZSP MJAR at 31.  As explained above, the SSA was not bound by these earlier (and incorrect) findings, and appropriately undertook a holistic review of the record to evaluate DZSP and Fluor's proposals.

First, the 2016 TET was incorrect that ████████████ was relevant, as thoroughly explained by Fluor in an earlier round of GAO protests, and the SSA rightfully rejected this relevancy finding.  The basis for the earlier TET's determination of "meaningful involvement ████████████████████████████████████████████████ was its belief that ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████   AR Tab 188 at 23900; AR Tab 168 at 26019.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ ████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

---

[7] *See* AR Tab 199 at 27235.

████████████████████████████████████████████████

Redacted Version

Contrary to DZSP's assertion that Fluor received favorable credit for "statements strikingly similar to those made by DZSP," DZSP's own brief undercuts its argument. *See* DZSP MJAR at 31.  As DZSP acknowledges, Fluor's past performance strength was based, in part, on ███████████████████████████████████████████ ███████████████████████████████████████████████ *Id.* (citing AR Tab 240 at 297991).  The record belies DZSP's statement that its proposal "established a far stronger connection." *Id.*

And the SSA correctly rejected ██████████████ as not attributable to DZSP.  DZSP argues that it was irrational for the SSA to reject this contract because ██████████ ███████████████████████████████████████████████████ ██████████████ DZSP MJAR at 32.  But DZSP ignores the fact that the SSA was otherwise not provided any meaningful way to evaluate whether ████████████████ ██████████████████████████████████████████ As the SSA noted, the "meaningful involvement" of ██████ as an affiliate of DZSP's was based on █████████████████████████████ AR Tab 240 at 29780.  SSA rationally rejected this contract as not providing any insight into DZSP's ability to perform. *See id.*

Second, the basis for the TET's determination of "meaningful involvement of ████ ██████████████████████" so that it could consider the ████████████████████ ██████████████ was its belief that ████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████ AR Tab 188 at 26900.  This was also incorrect.



Redacted Version

DZSP's proposal does not state that █████████████████████



Again, DZSP takes Fluor's proposal out of context to argue that Fluor received credit for similar statements.  DZSP MJAR at 31.  Unlike DZSP's vague allusion to expertise, Fluor's proposal referenced the ████████████████████████████

████████████████████████████████████████████

████████████████████████████

███████   *See* AR Tab 240 at 29789-90.

In sum, the Navy had the option—not the obligation—to consider past performance references for affiliated entities of DZSP provided that DZSP showed that those entities would be meaningfully involved in performance.   DZSP's proposal did not show that meaningful involvement of either affiliate ████████████████.  The TET's conclusion that it did was based on a demonstrably incorrect reading of DZSP's proposal; the SSA's decision to exercise her

discretion to disagree merely corrected the TET's misunderstanding.  *See Guardian Moving &*

*Storage Co. v. United States*, 122 Fed. Cl. 117, 132 (2015) (rejecting protester's argument that

agency's evaluation conclusion was "irrational" because it was different from a previous

evaluation: "[A]n agency has the discretion to re-evaluate proposals during a corrective action

and to correct prior evaluation errors.") (quoting and citing *Sotera*, 118 Fed. Cl. at 262; *Glenn Def.*

*Marine (Asia), PTE Ltd. v. United States*, 105 Fed. Cl. 541, 569 (2012)).

## V.   The Navy's Technical Approach Evaluation Was Reasonable.

Finding nothing to challenge under Factor D, Technical Approach, to undercut Fluor's

innovations and strengths to improve performance, DZSP also objects to the SSA's assignment

of an adjectival technical/risk rating of ████████████ when the SSA had previously used a

████ rating for DZSP.  DZSP MJAR at 33.  DZSP's argument is just another example of its

effort to focus on adjectival ratings—mere guides to intelligent decision-making—rather than

substance.  *See Lockheed Martin Corp. v. United States*, 124 Fed. Cl. 709, 728 (2016) ("The

rating itself is less important than the rationale behind it.").  What mattered to the SSA was the

substance of Fluor's proposal: the "████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

████████████████  AR Tab 240 at 29799.  This was unaffected by the SSA's

identification of a combined technical/risk rating of ████████████████████

DZSP opportunistically seizes on this descriptor to take this Court's prior language out of

context and argue for the imposition of an unwarranted and unrequired limitation on the SSA's

discretion to evaluate proposals.  *See* DZSP MJAR at 33 (excerpting AR Tab 238 at 29769).

This Court held that the Navy must explain its "reversal of [a prior] evaluation," not, as DZSP

████████████████████████████████████

would require, that the SSA must discuss at great length each difference.  AR Tab 238 at 29769.

This Court held that the Navy failed to explain adequately why it had now rejected DZSP's

proposed ████████████ as realistic when it had found the opposite before.  *Id.*  Here, the fact

that the SSA—having re-reviewed the proposals as required by the Court's decision—

determined that the appropriate risk from DZSP's past performance submissions was ████████

████████ rather than merely ██████ does not warrant any further explanation than the lengthy

discussion of DZSP's proposal in the SSA's decision.  AR Tab 240 at 29779-85.  In any case,

there is no indication that any change to the ancillary risk rating played a role in the source

selection decision—DZSP was rated Good before and after the most recent evaluation.  The SSA

did not refer to the risk rating in her Factor D comparative analysis, *id.* at 29799, nor in her best

value trade-off analysis.  *Id.* at 29800-01.  DZSP is not entitled to corrective action based on this

evaluative judgment.

## VI.   The Navy's Source Selection Decision Was Reasonable.

DZSP attacks the Navy's source selection decision as undetailed, irrational, and

unexplained, harping on adjectival ratings and the short period between the Court's last protest

decision and the SSA's completion of a new evaluation and source selection decision,[8] and

recycling its attacks under each of the non-price factors.  DZSP MJAR at 34-35.  Each of

---

[8] DZSP's allegations that the SSA rushed the decision through is essentially an allegation of bad faith; DZSP has offered no reason for this Court to disregard the presumption that government officials act in good faith.  *Galen Med. Assocs. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) ("[W]hen a bidder alleges bad faith, 'in order to overcome the presumption of good faith, the proof must be almost irrefragable.'").

Redacted Version

DZSP's arguments boils down to this:  the SSA awarded the Contract to Fluor now, which is different from when it awarded the Contract to DZSP.

This argument has been rejected before.  In *Sotera*, 118 Fed. Cl. at 263, the agency took corrective action after a GAO protest challenging award of a best value procurement to a lower priced, lower rated offeror.  During corrective action, the agency re-evaluated proposals and decided to award to a higher priced, higher rated offeror.  *Id.*  The protester argued that the source selection decision was inadequate to explain why the source selection authority had "changed his mind."  *Id.*  The Court rejected the theory, specifying that there is no "heightened standard for documentation when an SSA changes his mind as to contract award" and clarifying that the question was only whether the source selection decision at issue "satisfies the requirements of FAR 15.308."  *Id.*

The SSA's decision more than satisfies the FAR 15.308 requirement for a decision "based on a comparative assessment of proposals against all source selection criteria in the solicitation" with a documented "rationale for any business judgments and tradeoffs."  *Id.* at 263-64 ("[N]othing in FAR 15.308 can be interpreted as heightening the documentation requirement for an award decision based on a re-evaluation of proposals, as opposed to an initial evaluation of proposals").  The SSA even went beyond the FAR's requirements to acknowledge that her decision was different, and enumerate reasons for that difference.   AR Tab 240 at 29801. Nothing more is required.

## VII.   **DZSP Is Not Entitled to Permanent Injunctive Relief.**

In deciding whether a permanent injunction should issue, a court considers: (1) whether the plaintiff has succeeded on the merits; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective

Redacted Version

parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004). "Injunctive relief is an extraordinary remedy that will not be granted unless the plaintiff meets the heavy burden of meeting the four aforementioned factors." *Ceres Gulf, Inc. v. United States*, 94 Fed. Cl. 303, 322 (2010).

As discussed above, DZSP cannot and will not succeed on the merits of its protest—a circumstance that is fatal to its attempt to secure injunctive relief. Indeed, the record confirms that the Agency reasonably evaluated DZSP and Fluor's proposals in accordance with the Solicitation and the Court's earlier decision.

Further, the balance of harms and public interest favor denial of DZSP's request for injunctive relief. The Court must, in addition to considering hardships on the plaintiff, consider the harm to the Government, the intervening defendants, and other interested parties from the requested injunctive relief. *Akal Sec., Inc. v. United States*, 87 Fed. Cl. 311, 320 (2009); *see also Reilly's Wholesale Produce v. United States*, 73 Fed. Cl. 705, 715-716 (2006). When the balance of harms weighs in favor of the Government and other interested parties, an injunction is not appropriate. *Id.*

DZSP seeks injunctive relief that will turn all the Navy's efforts to award this contract into a five-year waste of time. If the contract is re-competed the Navy will, moreover, incur significant costs and expend tremendous effort, while keeping the Guam BOS program's direction up in the air for an indefinite period—hardly a recipe for high efficiency and morale among the workforce, as services are provided on some form of sole-source bridge contract or another. Against this enormous harm, DZSP, continuing to ride a series of sole-source bridge contracts which has already extended its incumbency for years, has not established it will suffer

Redacted Version

comparable harm—certainly no harm beyond what every unsuccessful offeror faces.  Thus, the balance of hardship weighs in favor of the defendants, and injunctive relief is not appropriate.

Nor has DZSP shown that the public interest, in the integrity of the procurement system, has been ill-served here.  *CW Gov't Travel, Inc. v. United States*, 61 Fed. Cl. 559, 576 (2004).  DZSP has failed to show that the Navy acted outside a range of reasonableness or otherwise engaged in an abuse of discretion.  In addition, the hardship to the Government and to Fluor of delaying this procurement even more is not outweighed by the incumbent's apparent sense of entitlement to this work.  *See* DZSP MJAR at 39 (arguing that the Navy should keep extending DZSP's bridge contract indefinitely to maintain BOS services).  The Government's needs and the public interest in fair and efficient procurement are best served by upholding the Agency's thorough and well-reasoned evaluation and source selection decision.

## CONCLUSION

For each of these reasons, Fluor requests that the Court grant the Government and Fluor's Cross-Motions for Judgment on the Administrative Record and deny DZSP's Motion for Judgment on the Administrative Record.

Respectfully submitted,

<u>s/ Richard B. O'Keeffe, Jr.</u>
Richard B. O'Keeffe, Jr.
Samantha S. Lee
George E. Petel
William A. Roberts, III
WILEY REIN LLP
1776 K Street, N.W.
Washington, DC 20006
Tel: (202) 719-7396
Fax: (202) 719-7049
rokeeffe@wileyrein.com
*Counsel for Fluor Federal Solutions, LLC*

Date: June 28, 2018

-35-

Exhibit redacted in its entirety